J-S21015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 467 EDA 2025 |

Appeal from the Decree Entered January 22, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000434-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 468 EDA 2025 |

Appeal from the Decree Entered January 22, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000435-2024

BEFORE:   KUNSELMAN, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JULY 25, 2025**

In this consolidated matter, G.B. (Mother) appeals from the decrees granting the petitions filed by the Philadelphia Department of Human Services (the Agency) which terminated her rights to her now four-year-old twins, son N.T.B. and daughter N.L.B. (collectively, the Children), pursuant to the

_____

[*] Retired Senior Judge assigned to the Superior Court.

Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). After review, we affirm.

The record discloses the following factual and procedural history. The Children first became known to the Agency in February 2021, around the time of their births.[1] The Agency received a report alleging that Mother used drugs during her pregnancy and was previously diagnosed with bipolar disorder. The family subsequently stabilized, and the case was closed out. **See** Petitions for Involuntary Termination of Parental Rights, 11/22/24, at 3 (unnumbered).

The Agency received another report in June 2023 alleging that Mother was involuntarily hospitalized for mental health treatment, and the Children were in her family's care. **See id.** Mother testified at the termination hearing that the case opened because her cousin was watching the Children, did not pay attention, and the Children got outside. **See** N.T., 1/22/25, at 12. Mother admitted to struggling with mental health and drug issues. **See id.** at 12-13. She stated that she "had [herself] 302'd" and tested positive for drugs. **Id.** at 13. She said that the Children were taken and originally put in kinship care, but her family was not supportive. **See id.**

The Agency ultimately obtained an Order of Protective Custody in July 2023 for the Children and placed them in foster care. **See** Petitions for

_____

[1] We note that Mother also had two older children; she voluntarily relinquished her rights to those children before the events of the instant case began. **See** Petitions for Involuntary Termination of Parental Rights, 11/22/24, at 3 (unnumbered); N.T., 1/22/25, at 66-67, 72. Neither older child was involved in these appeals.

Involuntary Termination of Parental Rights, 11/22/24, at 5 (unnumbered). The Children were subsequently adjudicated dependent. *See id.* Mother's single case plan objectives included: having supervised visitation at the Agency; engaging in mental health and drug and alcohol treatment; obtaining and maintaining appropriate housing, employment, and income; signing all necessary consents and releases; cooperating with the Community Umbrella Agency (CUA) worker on a regular and consistent basis; and providing random drug screens. *See* N.T. at 29-30, 84-85.

The Agency filed petitions to involuntarily terminate Mother's parental rights on November 22, 2024, approximately 16 months after the Children entered foster care. The orphans' court held a termination hearing on January 22, 2025.[2] Mother, the CUA case manager supervisor, the CUA case manager,

_____

[2] The Children were represented by a child advocate attorney from the Support Center for Child Advocates at the termination hearing. On appeal, three attorneys, presumably all from the Support Center, wrote a brief on the Children's behalf and identified themselves as counsel and guardians *ad litem* (GAL) for the Children. In the brief, the child advocates acknowledge that they served as both legal counsel and GALs for the Children at the termination hearing. *See* Children's Brief at 17.

Our Supreme Court has mandated that appellate courts *sua sponte* "verify that the orphans' court indicated that the attorney [in a dual role of GAL and legal counsel] could represent the child's best interests and legal interests without conflict." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020); *see also* 23 Pa.C.S.A. § 2313(a). Counsel representing a child's legal interests must advocate for the child's preferred outcome even if counsel does not agree with it, whereas the GAL representing a child's best interests must express what the GAL "believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the
*(Footnote Continued Next Page)*

the visitation coach, the Children's resource parent, and Mother's cousin

testified. At the end of the hearing, the orphans' court involuntarily

_____

child agrees." **In re T.S.**, 192 A.3d 1080, 1082 n.2 (Pa. 2018) (citation omitted).

The child advocates acknowledge that the record does not contain findings by the trial court regarding whether a conflict existed between the Children's legal and best interests. **See** Children's Brief at 18. We note with displeasure that the certified record does not even include the order appointing legal counsel to represent the Children at the termination hearing. However, in this case, the Children were almost four years old at the time of the termination hearing, had special needs, and there is record evidence that they were either nonverbal or had a limited ability to communicate verbally. **See** N.T. at 155 (Mother's cousin stating that the Children were not speaking prior to removal); **Id.** at 139-40 (during an exchange regarding an objection, the resource parent noting that N.T.B. was nonverbal and Mother stating, "They can't talk."); **Id.** at 108 (the case manager noting that the Children "asked for snacks"); **Id.** at 32 (Mother stating that she gets the Children to talk and say please and thank you); **Id.** at 102-03 (the case manager stating that the Children have been diagnosed with autism and require specialized services); Petitions for Involuntary Termination of Parental Rights, 11/22/24, at 4 (unnumbered) (noting that on July 21, 2023, the Agency learned that N.L.B. was nonverbal). The child advocates also assert that the record established that the Children were unable to speak. **See** Children's Brief at 18. Given the Children's young ages, their special needs, and their stages of development, it would have been impossible to ascertain their preferred outcomes. Thus, there could not have been a conflict between the Children's interests, and dual representation was appropriate. **See T.S.**, 192 A.3d at 1088 (recognizing that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously.").

Nevertheless, we caution and remind the orphans' court and all counsel that the orphans' court is required to determine whether counsel can represent the dual interests of a child **before** appointing an individual to serve as GAL/counsel for the child. **See K.M.G., supra**. Further, as this Court noted in a recent case, "any counsel present in court is also well-positioned to remind the [orphans'] court of its duty." **Matter of Adoption of A. C. M.**, 333 A.3d 704, 709 (Pa. Super. 2025) (footnote omitted).

- 4 -

terminated Mother's, and any unknown father's, parental rights to the Children.

Mother timely filed an appeal from the termination decree for each child. This Court consolidated her appeals *sua sponte* on March 26, 2025. Mother presents the following four issues[3] for our review:

1. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa. C.S.A. sec. 2511(a)(1) without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties.

2. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa. C.S.A. sec. 2511(a)(2) without clear and convincing evidence of [M]other's present incapacity to perform parental duties.

3. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa. C.S.A. sections 2511(a)(5) and (8) without clear and convincing evidence to prove that reasonable efforts were made by Department of Human Services to provide [M]other with additional services, and that the conditions that led to placement of the [C]hildren continue to exist.

_____

[3] Mother only raised two issues in her Appellate Rule 1925(b) statements. Mother's first issue challenged the sufficiency of the evidence to terminate her parental rights under Section 2511(a) because she was "substantially compliant with her single case plan goals and had resolved all issues that brought the child into the care of [the Agency]." Statements of Matters Complained of on Appeal Pursuant to [Pa.]R.A.P. 1925(b), 2/19/25. Mother's second issue challenged the sufficiency of the evidence to terminate her parental rights under Section 2511(b). **See id.** We remind and caution Mother and her counsel that, pursuant to Appellate Rule 1925(b), "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii). Nevertheless, because the issues raised in Mother's brief are derivative of the issues included in her Appellate Rule 1925(b) statement, our appellate review was not impeded. Thus, we decline to find waiver in this instance.

> 4. Whether the trial court erred by terminating the parental rights of [M]other pursuant to 23 Pa. C.S.A. sec. 2511(b) without clear and convincing evidence that there is no parental bond between [M]other and her [C]hildren, and that termination would serve the best interest of the [C]hildren.

Mother's Brief at 7.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search

- 6 -

the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Furthermore, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted);

*see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

As noted, the orphans' court terminated Mother's rights under Section 2511(a)(1), (2), (5), (8), and (b). As we may affirm under any of the subsections of Section 2511(a), we review the court's decision as to Section 2511(a)(8). That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To prove this subsection, the Agency must establish the following three elements: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *M.E.*, 283 A.3d at 832 (citation omitted). Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement" of the child. *Id.* (citation omitted). Instead, the relevant inquiry "is whether the conditions that led to

removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." ***Id.*** (citation omitted).

Importantly, under this subsection, the court "shall not consider any efforts by the parent to remedy the conditions described [in the termination petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). This provision may seem harsh as it prohibits the court from considering the parent's recent progress. However, as this Court has explained:

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***M.E.***, 283 A.3d at 832 (citation omitted).

Finally, although Section 2511(a) focuses generally on the parent's behavior, the third element of subsection (a)(8) centers on the child's needs, thereby encompassing the needs and welfare analysis typically reserved until the court's Section 2511(b) analysis. This Court has explained:

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they

are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re E.J.C.*, ___ A.3d ___, 2025 PA Super 95 (filed May 2, 2025) (citing *In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*)).

Here, at the end of the termination hearing, the orphans' court concluded that the Agency had proven, by clear and convincing evidence, the statutory grounds for termination under Section 2511(a)(8).[4] The court provided the following reasoning, in relevant part:

> It's very clear to me that [M]other loves her [C]hildren in this case, but I do find that the [Agency] has met its burden by clear and convincing evidence through credible witnesses, to involuntarily terminate rights in this case as to the biological [M]other and to any unknown father in this case.
>
> These are two special needs children. TPR petitions were filed in this case on November 22, 2024. [. . .]
>
> [. . .]
>
> Under Subsection [2511(a)](8), [. . .]
>
> It has been more than 12 months. I again find that termination would best serve the needs and welfare of the [C]hildren, as it would free them to have permanency in their life, and the conditions which led to removal -- or placement continue to exist -- absent any demonstration of [M]other successfully completing -- [] the programming that th[e] [orphans'] [c]ourt has referred her to multiple times throughout the life of this case.

---

[4] We note that, on appeal, the orphans' court relied on the reasons it stated on the record to support its termination decrees, rather than filing an Appellate Rule 1925(a) opinion.

N.T. at 166-172.

On appeal, Mother presents a combined argument for why terminating her parental rights under Section 2511(a)(5) and (8) was allegedly improper. She asserts the following:

> Again, in their efforts to establish proof of these sections of the Act, [the Agency] presented the testimony of the CUA caseworker [. . .]. Her testimony suggested that [M]other's completion of the dual diagnosis program at Goldman Clinic did not satisfy the single case plan goal of mental health treatment, as previously discussed, despite never communicating this point to [M]other. Notwithstanding the fact that [M]other did indeed complete the dual diagnosis program at Goldman Clinic, [M]other was also actively engaged in mental health treatment at Pan American and had previously treated at Community Council. Throughout the entire hearing, [the Agency] consistently failed to establish that [M]other was no longer actively engaged in mental health treatment. [The Agency] also failed to establish that [M]other had not, or will not, remedy the mental health issues within a reasonable period of time. On the contrary, [M]other's active engagement in mental health treatment at Pan American, combined with her successful completion of the dual diagnosis program at Goldman Clinic, indicates that the issue has been remedied or will be remedied within a reasonable period of time.

> There is no legal basis to terminate the parental rights of [Mother] pursuant to sections 2511(a)(5) and (8) because no clear and convincing evidence was presented to prove that the conditions that led to placement of the [C]hildren continue[] to exist. Additionally, no clear and convincing evidence was offered to establish that termination would best serve the needs and welfare of the [C]hildren, as discussed below.

Mother's Brief at 16-17 (internal citations omitted).

Mother's argument confuses the requirements of Section 2511(a)(5) and Section 2511(a)(8). Although these subsections contain some similar

elements, they also have key differences. Specifically, Section 2511(a)(5) requires consideration of a parent's ability or willingness to remedy the conditions that led to the removal of the child. As noted, and contrary to Mother's argument, Section 2511(a)(8) does not require this evaluation. **See M.E.**, 283 A.3d at 832 (citation omitted). Section 2511(a)(5), unlike Section 2511(a)(8), also requires an evaluation of whether the services or assistance reasonably available to the parent are not likely to remedy the conditions within a reasonable period of time. Thus, some of Mother's argument is not relevant to a Section 2511(a)(8) analysis.

Further, Mother's argument fails to appreciate our standard of review in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. **See T.S.M.**, 71 A.3d at 267 (citation omitted).

Our review of the record supports the orphans' court's decision. The Children were removed from Mother's care in July 2023; the Agency filed its termination petitions on November 22, 2024; and the termination hearing occurred on January 22, 2025. **See** N.T. at 14-15, 38-39, 159, 166-67. Thus, more than 12 months had elapsed since the Children's removal.

The Children were removed from Mother's care mainly due to concerns with her mental health and substance abuse. **See id.** at 12-13, 15-16. Although Mother testified about receiving drug and alcohol and mental health treatment, her testimony was inconsistent, and she could not clearly recall the

dates of her treatment or completion statuses. Mother testified about obtaining treatment at multiple places including: The Behavioral Wellness Center, Community Council, Pan American, Gaudenzia, and Interim House. **See id.** at 17, 19-22, 41-45. Mother received either substance abuse or mental health treatment at those places, for varying lengths of time.

The Agency introduced a letter from The Behavioral Wellness Center. The letter stated that Mother had been a participant at the center since October 16, 2024 and had "requested her completion of the program" as of January 10, 2025. **See** DHS Exhibit #5. The letter also stated that Mother had good attendance and was able to attend her group and individual sessions. **Id.** Nevertheless, Mother requested completion of her program and indicated that the program was self-paced. **See** N.T. at 18-19, 37-38. She refers to this program as a dual diagnosis program on appeal. However, Mother and the case manager testified about this being solely a drug and alcohol treatment program, not a mental health treatment program. **See id.** at 17, 40-41, 43-44, 92, 112-14.

Although the CUA case manager indicated that Mother was complying with all her objectives, she rated Mother's compliance as moderate because Mother was not consistent in her treatment. **See id.** at 99-101. The case manager elaborated that Mother would continuously end a program and start a new program, jumping between programs rather than staying at one. **See id.** at 101. Further, the case manager rated Mother's progress towards

alleviating the circumstances that brought the Children into care as minimal. *Id.* at 104. The case manager stated that Mother would need to be more consistent to increase her progress rating. *See id.* Further, the case manager did not believe that the Children could be safely returned to Mother's care at the time of the hearing because she did not have enough documentation to support Mother's mental health status. *See id.* at 104-05.

Although we do not have the permanency review orders in our certified record, the Agency entered the dependency docket as an exhibit at the termination hearing. From the information on the docket we can see that: on November 15, 2023, Mother had moderate compliance with the permanency plan and moderate progress towards alleviating the circumstances that led to placement; on May 3, 2024, Mother was rated as substantially compliant with moderate progress; on August 2, 2024, Mother was rated as fully compliant with substantial progress; on October 30, 2024, Mother was rated as moderately compliant with minimal progress. *See* DHS Exhibit #4. Thus, these orders support the testimony and the trial court's finding that Mother's compliance and progress was not consistent. *See* N.T. at 168.

Additionally, one of Mother's single case plan objectives related to employment and income. *See id.* at 29-30. Although Mother testified at the hearing that she was employed at that time, she admitted that she had started that job the Friday before the hearing and only worked two or three hours a day. *See id.* at 46-47, 66. Before that, Mother held one position for one

month and another position for six months. *Id.* at 66. The CUA case manager confirmed that Mother had told her multiple times that she had started and ended a job. *Id.* at 117.

Regarding visitation, as of the hearing date, 18 months after the Children had been removed, Mother had not progressed past two-hour supervised visits. Although the visitation coach stated that the supervised visits went well, she noted that Mother sometimes became overwhelmed when engaging with both Children. *See id.* at 146-48. The visitation coach also indicated that she would want Mother to be able to successfully redirect N.T.B. and maintain engagement with both Children consistently prior to expanding any visitation because Mother was building on skills. *See id.* at 148-49. The case manager testified that she would have concerns with Mother having unsupervised contact with the Children at that time. *Id.* at 122.

Related to Mother's other objectives, she admitted that she had issues going to some of her required random drug screens. *See id.* at 49. The case manager confirmed that Mother could not attend at least two of the screens, so the case manager sent her for additional screens. *See id.* at 96. Additionally, Mother stated that she was doing parenting classes but had not finished them. *See id.* at 30. Mother also admitted that she did not successfully complete her family school objective because she got mad and said things she should not have said. *See id.* at 33. The orphans' court noted this when making its decision. *See id.* at 170 ("[M]other was referred for her

own assistance to Family School. That was also not completed, and in fact, had to be dismissed due to [M]other's own conduct.").

Thus, the record evidence supports a finding that the conditions which led to removal were not remedied and reunification between Mother and the Children was not imminent at the time of the termination hearing, 18 months after the Children were removed. *See M.E.*, 283 A.3d at 832 (citation omitted). We commend Mother for the progress she has made in overcoming her substance abuse and mental health issues. However, we reiterate that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* (citation omitted). We also reiterate that our role as an error-correcting appellate court does not include searching the record for contrary conclusions or substituting our judgment for that of the orphans' court. *See S.K.L.R.*, 256 A.3d at 1124. When the record supports the orphans' court's decision, we must affirm even though evidence exists that would also support a contrary determination. *See P.Z.*, 113 A.3d at 849 (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Therefore, we discern no error of law or abuse of discretion with the orphans' court's analysis of the first two elements of Section 2511(a)(8).

Regarding the third element of Section 2511(a)(8), the orphans' court determined that termination best served the needs and welfare of the

Children. The court noted that the Children were three years old and what is "most important for these [C]hildren is to have permanency and consistency in their life -- and termination of parental rights would serve those needs." N.T. at 170-71. Further, "termination would best serve the needs and welfare of the [C]hildren, as it would free them to have permanency in their life . . . ." *Id.* at 171.

The record supports the orphans' court's conclusion. As noted, the Children were in care for approximately 18 months prior to the termination hearing, and Mother had not progressed past supervised visits. The Children have special needs and the case manager testified that with their autism diagnoses, it is extremely important for them to have a safe and stable living environment. *See id.* at 103. The case manager stated that the Children's resource parent provided them with safety and stability. *See id.* The resource parent also provided financially for the Children, whereas Mother did not. *See id.* at 106-07. The resource parent takes the Children to their medical appointments, and they look to her when they are sick, hungry, or hurt. *Id.* at 106. The case manager indicated that she believed it was in the Children's best interest to be freed for adoption. *Id.* at 107.

Additionally, the resource parent testified that Mother was inconsistent with calling; sometimes she would call regularly and sometimes she would not. *See id.* at 133-34. The resource parent also indicated that Mother

sometimes struggles to manage both Children at the same time and gets frustrated. *See id.* at 131.

Thus, the record supports the orphans' court's decision that termination best served the Children's needs and welfare. We discern no error of law or abuse of discretion with the court's analysis of the third element of Section 2511(a)(8).

Mother's fourth issue challenges the orphans' court's findings under Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child) (citation omitted).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" ***K.T.***, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." ***Id.*** at 1106 (citing ***T.S.M.***, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. ***Id.*** (citing ***T.S.M.***, 71 A.3d at 268; ***In re D.C.D.***, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's parental rights was in the Children's best interest. The court explained:

> I again find that termination would best serve the needs and welfare of the [C]hildren, as it would free them to have permanency in their life [. . . .] Under Subsection B, I don't find that it's a parent-child bond, that the [C]hildren have a necessary and beneficial relationship with their [M]other.
>
> I believe that they enjoy seeing their [M]other and spending time with her, but it is not a parental bond. They don't look to [M]other to meet any of their parental needs. She has been a visitation resource for them for the life of this case, but I find that this is not the parental bond as defined under 2511(b).

N.T. at 171-72.

On appeal, Mother argues that she and the Children have strong emotional bonds. Mother's Brief at 17. Mother was actively engaged as a

vital caregiver for the Children during the formative time in their lives. *See id.* She cared for, and supported, the Children. *See id.* Mother argues that there is an "indisputable and unbreakable bond" between her and the Children, which she continued to strengthen through consistent visitation. *See id.* at 17-18.

Mother notes that the CUA case manager acknowledged that she never observed Mother interact with the Children, but she testified that the Children would not be harmed by termination. *See id.* at 18. Mother claims that the trial court "inexplicably" relied on the case manager's opinion and ignored the testimony of the visitation coach, who had observed Mother and the Children together and testified to positive interactions between them. *See id.* Mother asserts that no clear and convincing evidence was offered to indicate that she cannot provide for the Children's needs or that termination would serve the Children's best interests. *See id.* Instead, Mother asserts that termination would severely and irreparably emotionally harm the Children. *See id.*

Mother's argument again fails to appreciate our standard of review. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M., supra*.

Here, the record supports the orphans' court's findings. The case manager testified that she did not think there was a parent-child relationship between the Children and Mother, and the Children do not look to Mother to fulfill their daily parental needs. *See* N.T. at 105. The case manager also

believed that it was in the Children's best interest to be freed for adoption because they were in a stable environment and appeared to be doing well. *Id.* at 107. The Children's resource parent was a pre-adoptive home, and the Children were up to date on their needs. *See id.* at 107-08. The case manager described the Children and their resource parent as a "traditional family." *See id.* at 108.

Contrary to Mother's argument, the record does not indicate that the orphans' court ignored the visitation coach's testimony. The court noted its belief that the Children enjoyed seeing Mother and spending time with her. *See id.* at 172. However, the court found that the Children's and Mother's relationship did not rise to the level of a parental bond because the Children do not look to her to meet any of their needs. *See id.* Instead, Mother had been a visitation resource for them. *See id.* The court's finding is supported by the record considering the Children were in care for 18 months, and Mother only had supervised visits with them. Mother's challenge to Section 2511(b) merits no relief.

In sum, we discern no abuse of discretion or error of law in the orphans' court's decision to terminate Mother's parental rights under Section 2511(a)(8) and (b) of the Adoption Act.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/25/2025